**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>v.<br><br>Chester Wayne Wilson,<br><br>                Defendant. | No. CR-15-02231-TUC-CKJ (LCK)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court are Defendant's Motion to Suppress Statements (Doc. 29) and Defendant's Motion to Suppress Fruits of Illegal Seizure (Doc. 30). This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 57.6. Evidence and argument were heard on July 18, 2016, and August 17 and 19, 2016.[1] This matter was submitted following oral argument at the conclusion of the hearing.

Defendant alleges his statement was involuntary and the government agents lacked probable cause to seize the package. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motions to suppress.

---

[1] "RT" refers to the Reporter's Transcript of the July 18, and August 17, 2016 evidentiary hearing. (Docs. 58, 68.)

## I. FACTUAL BACKGROUND

DEA Special Agent Julio Chicas testified that, in July 2015, DEA agents Bell and Key from Panama City, Florida notified him that a Chester Wayne Wilson was supplying methamphetamine to persons in Florida. (RT 7/18/16 at 12, 61; RT 8/17/16 at 11-12, 14-16.) Based on a records check on Wilson, on August 12, 2015, DEA agents conducted surveillance at an address on Lola Place, at which agents saw a motorcycle registered to Wilson. (RT 7/18/16 at 12-13; RT 8/17/16 at 26-27.) They also observed a green Bravada and a silver Honda Civic at that address, both of which were registered to Lee Allen Babb. (RT 7/18/16 at 12-13; 26-27.) The records check included Wilson's driver's license photo. (RT 8/17/16 at 29.)

Agents Bell and Key informed SA Chicas that, on November 17, 2015, they would be sending money to Wilson at a townhome located at 2505 North Dodge. (*Id.* at 14-16.) Florida agents provided Tucson agents a tracking number which allowed the Tucson agents to track when the FedEx truck would be delivering the package of money. (RT 7/18/16 at 17.) SA Chicas conducted surveillance at the Dodge address and Wilson arrived there in the Bravada at 9:23 a.m., just before the FedEx truck was scheduled to arrive. (*Id.* at 16-17.) The agents could not observe the actual FedEx delivery but the truck arrived at that address at 9:26 a.m. (*Id.* at 17; RT 8/17/16 at 38.) Wilson left that address approximately one hour later with a satchel. (RT 7/18/16 at 18.)

Agents Bell and Key informed SA Chicas that they anticipated Wilson shipping them a package of methamphetamine on November 18, 2015. (*Id.*) SA Chicas set up surveillance on the 18th, beginning at 5:30 p.m. at Wilson's house and the FedEx shipping center, because this was shortly before FedEx closed at 6 p.m. (*Id.* at 29-30, 51.) During a call between Wilson and an undercover agent (UA), at 5:40 p.m.[2] on the 18th, Wilson clarified that he was to ship the methamphetamine to Conlon at 4003 West 19th Street, Panama City, FL 32405. (*Id.* at 25-26; Ex. 12 at 4.) Wilson told the UA that he

---

[2] The times have been adjusted to reflect Mountain Standard Time in Tucson. The transcript times are in Central Standard Time.

- 2 -

was right on schedule and that he didn't like leaving packages "sitting around there all day . . . people walking by it all . . . day long." (Ex. 12 at 5-6.) Wilson arrived at the FedEx location at 5:50 p.m. driving the Civic. (RT 7/18/16 at 30.) He entered the facility with a package and filled out a shipping label. (*Id.*; RT 8/17/16 at 52.) At 6:02 p.m., Wilson called the UA with a tracking number. (Ex. 12 at 6-7.) The agents in Tucson received confirmation that the agents in Panama City received a package from Wilson containing methamphetamine. (RT 7/18/16 at 31-33; RT 8/17/16 at 31-32.)

At 1:31 p.m. on November 19, 2015, Wilson called the UA and stated that another package of methamphetamine would arrive Friday morning. (Ex. 12 at 19-20; RT 7/18/16 at 33.) Agents Key and Bell informed SA Chicas that Wilson was expected to ship methamphetamine again that day. (RT 7/18/16 at 31.) SA Chicas received notice a few hours prior to the shipping of the package but it did not occur to him to get a search warrant because he "didn't know he needed it." (*Id.* at 62-63.) At 4:52 p.m., the UA called Wilson with a tracking number for the money being sent to Wilson, and Wilson provided a tracking number for the methamphetamine he would be sending to the UA that day. (Ex. 12 at 22-23; RT 7/18/16 at 34-35.)

SA Chicas again set up surveillance at the FedEx shipping facility. (RT 7/18/16 at 35-36.) Wilson arrived at the FedEx facility at approximately 5:50 p.m. in the Bravada. (*Id.* at 36.) After Wilson parked his vehicle, a DEA agent saw Wilson hand a package to Shane Karwoski, who was in the vehicle with him. (*Id.* at 36-37.) As Karwoski approached the FedEx building with the package, both Karwoski and Wilson were arrested. (*Id.* at 37-38; RT 8/17/16 at 56.) The package was seized at that time. (RT 8/17/16 at 56.) The tracking number on the package matched the number Wilson provided to the UA over the phone. (*Compare* Ex. 4 *with* Ex. 12 at 23.) The package was being shipped to John Conlon at the Panama City address provided by the UA. (Ex. 4; RT 7/18/16 at 39-40.) The sender's address was 2505 N. Dodge, the address at which SA Chicas earlier conducted surveillance because the UA sent Wilson money there. (RT 7/18/16 at 40.)

Wilson was taken to the DEA office and at 6:13 p.m. that day he was read his *Miranda* rights. (*Id.* at 42.) The interview was conducted by SA Chicas and SA Stark, with SA Almaraz present for part of it. (*Id.*) No guns were visible and Wilson was not handcuffed for the interview. (*Id.* at 43.) Wilson stated that he understood his rights and he agreed to waive them and answer questions. (*Id.* at 43-44, 45; RT 8/17/16 at 81-82, 87.) Wilson stated that he did not want the interview recorded (which would have been standard DEA procedure) and he signed a form declining to have it recorded. (RT 7/18/16 at 45-46; RT 8/17/16 at 82; Ex. 1.) Wilson confirmed his signature on the recording declination form. (RT 8/17/16 at 76-77.) The interview lasted approximately one hour. (RT 7/18/16 at 52.)

According to SA Chicas, no agent pressured Wilson to make a statement. (RT 8/17/16 at 63.) During the interview, Wilson was calm and did not appear frightened or intimidated. (RT 7/18/16 at 51-52; RT 8/17/16 at 87.) Wilson testified the agents were not threatening and he wasn't forced to say anything. (RT 8/17/16 at 79, 82.) Wilson testified that he was high on heroin during the interview. (RT 8/17/16 at 90-91.)

SA Chicas testified that Wilson stated that he was shipping methamphetamine to Panama City, Florida, to a person he had not met and that Karwoski had no involvement. (RT 7/18/16 at 47.) When SAs Chicas and Stark told Wilson they had been conducting surveillance on him and knew he had been shipping methamphetamine to Florida for some time, Wilson stated, "What took you guys so long?" (*Id.*; RT 8/17/16 at 88.)

During the interview, SA Chicas asked Wilson if he would consent to SA Chicas opening the FedEx package and Chicas testified that Wilson consented. (RT 7/18/16 at 47-48, 58, 59; RT 8/17/16 at 64.) SA Chicas determined that Wilson's verbal consent was sufficient and he did not ask him to sign a consent form.[3] (RT 8/17/16 at 64-66.) Wilson testified that when the agents asked if they could open the package, he told them the

---

[3] SA Chicas testified that Wilson signed a consent form for the search of a cellphone because electronic devices are sent elsewhere for data extraction and forms are usually preferred. (RT 8/17/16 at 66.) Wilson testified that the signature on the cellphone consent to search form was not his and that he did not remember signing the form. (RT 8/17/16 at 77.)

- 4 -

1 package was not his so he could not give them permission to open it. (*Id.* at 70, 85.) At
2 the hearing, Wilson denied ownership of the package and testified that he gave Karwoski
3 a ride to FedEx and never handed the package to Karwoski. (*Id.* at 85, 87.)

4 Wilson testified that he told the agents that Karwoski had nothing to do with it
5 because he wanted Karwoski to be released so he could feed Wilson's dog. (*Id.* at 72.)
6 Wilson stated that after 30-45 minutes of the interview had elapsed, the agents promised
7 that they would let Karwoski go if Wilson talked to them. (*Id.* at 72-73, 74.) This
8 mattered to Wilson because he needed his dog fed; he spoke to the agents for the sake of
9 his dog. (*Id.* at 72, 73, 79, 83.) Wilson testified that he was reluctant to tell the agents
10 anything, he did not say very much to them during the interview, he didn't confess or
11 incriminate himself, and he did not agree with anything they said. (*Id.* at 71, 74, 75, 83,
12 89.) According to SA Chicas, neither he nor any other agent promised Wilson that if he
13 confessed, Karwoski would be released. (RT 7/18/16 at 50-51.)

## II. DISCUSSION

### A. PACKAGE

Wilson seeks to have the search of the FedEx package supressed, arguing the seizure of the package was illegal. Absent limited exceptions, agents cannot seize property without a warrant supported by probable cause. *United States v. Licata*, 761 F.2d 537, 540 (9th Cir. 1985).

**Standing**

A defendant may only claim the benefit of the exclusionary rule if his Fourth Amendment rights have been violated because he had a legitimate expectation of privacy in the item seized or searched. *See United States v. Salvucci*, 448 U.S. 83, 85 (1980). The defendant has the threshold burden of establishing his expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978); *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993).

At the hearing, Wilson testified that he had no ownership or interest in the package, that he merely drove Karwoski to FedEx on November 19. When the agents

1  asked if they could open the package, Wilson testified that he replied that he could not
2  give permission because it was not his package. A person has no Fourth Amendment
3  interest in property he has abandoned, which occurs when the person "so relinquish[s] his
4  interest in the property that he no longer retain[s] a reasonable expectation of privacy in it
5  at the time of the search." *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976). To
6  assess relinquishment, a court examines a person's actions, words, and other objective
7  signs. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). The Ninth Circuit
8  has found that express disclaimer of ownership, even if the person has previously been
9  seen in possession of the item, constitutes abandonment and the person has no standing to
10 challenge the search or seizure of the item. *See United States v. Veatch*, 674 F.2d 1217,
11 1220-21 (9th Cir. 1981) (defendant denied owning wallet lodged in seat of car where
12 defendant had been sitting) (citing *Jackson*, 544 F.2d at 1283); *United States v. Decoud*,
13 456 F.3d 996, 1001, 1007-08 (9th Cir. 2006) (defendant denied ownership of briefcase in
14 trunk of car he was driving). Accepting Wilson's testimony as true, his disavowal of the
15 package could constitute abandonment.

16 However, in conducting an evaluation of standing, the Court must consider all the
17 evidence and determine which is more credible. *Singleton*, 987 F.2d at 1449. SA Chicas
18 testified that Wilson was observed in the car handing the package to Karwoski. Further,
19 SA Chicas testified that Wilson stated that he had been shipping methamphetamine to
20 Panama City, Florida and that Karwoski had no involvement. SA Chicas also stated that
21 Wilson verbally consented to the agents opening the package.

22 The Court finds Wilson's testimony disavowing ownership of the package not
23 credible. On November 18, Wilson was recorded telling a UA that he didn't like to leave
24 packages sitting around at FedEx all day. (RT 7/18/16 at 26.) It is undisputed that Wilson
25 was observed personally delivering a package to FedEx at 5:50 p.m. that same day
26 (November 18) (ten minutes before closing time). (*Id.* at 29-30.) Critically, Wilson was
27 recorded at 4:52 p.m. on November 19th informing the UA that he would be shipping
28 another package of methamphetamine that day, and he provided the UA a tracking

number. (*Id.* at 31-35.) Wilson arrived at FedEx approximately one hour later, the same time he mailed the package of methamphetamine to the UA the previous day. (*Id.* at 36.) The package Karwoski was carrying when arrested had a tracking number on it that matched the tracking number Wilson had provided over the phone to the UA one hour prior. (*Id.* at 35-40.) Because the Court finds that Wilson had an ownership interest in the package, it concludes he has standing to contest the seizure of the package.

**Seizure of the Package without a Warrant**

Law enforcement agents may seize contraband in plain view without a warrant, if "there is probable cause to associate the property with criminal activity." *Payton v. New York*, 445 U.S. 573, 586-87 (1980); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.") (citing *Horton v. California,* 496 U.S. 128, 136–137 (1990); *Texas v. Brown,* 460 U.S. 730, 739 (1983) (plurality opinion)). If the agent has probable cause to know a sealed container contains contraband, the plain view rationale is equally applicable. *United States v. Blalock*, 578 F.2d 245, 249 (9th Cir. 1978) ("The inescapable nexus between the brown bag and the purpose of the Agents' entry and arrest of Blalock is too obvious to play riddle games."). Here, the warrantless seizure of the package was lawful if: "(1) the initial intrusion [was] lawful, and (2) the incriminatory nature of the evidence [was] immediately apparent to the officer." *United States v. Santillan*, 571 F. Supp. 2d 1093, 1100 (D. Ariz. 2008) (citing *United States v. Garcia,* 205 F.3d 1182, 1187 (9th Cir.2000)).

The Court first evaluates whether the agents had probable cause to arrest Wilson. *Blalock*, 578 F.2d at 247-48. Probable cause exists if, "at the time the arrest is made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Bailey v. Newland,* 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting *Beck v. Ohio,* 379 U.S. 89, 91 (1964)). "When

the officers involved are working in close concert with each other, the knowledge of one officer is the knowledge of all . . . in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause." *United States v. Bernard*, 623 F.2d 551, 561 (9th Cir. 1979); *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986).

Taking into consideration the knowledge of the DEA agents in both Panama City and Tucson, the Court finds they had probable cause to arrest Wilson. The agents in Florida identified Wilson as a person their UA was in contact with as a supplier of methamphetamine. The Tucson agents identified Wilson's residence from a driving records check that was confirmed by surveillance. His image was verified by a review of his driver's license photo. Several times the agents in Florida relayed information to the DEA agents in Tucson about packages Wilson was going to receive or send, based on conversations with Wilson. Each time, the information conformed with surveillance conducted in Tucson—Wilson timely appeared at the address on Dodge where the UA agreed to ship him cash; he appeared at the FedEx shipping location on both November 18 and 19 when he told the UA he would ship methamphetamine those days; and the agents in Florida received the November 18 package of methamphetamine shipped by Wilson. Specifically, just before 5 p.m. on November 19, Wilson told the UA in Florida that he was going to mail him the methamphetamine that day and provided the UA with a tracking number. Within the hour, just before FedEx closed, Wilson arrived at the FedEx facility and handed the package to his passenger (Karwoski) who approached the FedEx facility presumably to ship the package.

Taking into account the facts available to all of the agents involved, a reasonable person would believe Wilson was committing an offense. Next, the incriminatory nature of the package was immediately evident to the agents. Based on the information from the UA, the agents anticipated Wilson would be shipping methamphetamine that evening and he arrived at the FedEx facility with a package prepared for shipping. Therefore, the Court finds the seizure was lawful.

**Grounds to Search the Package without a Warrant**

One of the specifically established exceptions to the warrant and probable cause requirement is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In order for the prosecution to demonstrate that consent was voluntarily given, courts look at the totality of the circumstances surrounding the acquisition of consent. *Id*. at 223. Some of the factors taken into account have included "youth of the accused; or his low intelligence; his lack of education; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as deprivation of food or sleep." *Id*. at 226.

SA Chicas testified that shortly after reading Wilson his *Miranda* rights and beginning the interview, he asked Wilson if he would consent to a search of the package. According to SA Chicas, Wilson verbally consented to the search. In contrast, Wilson testified that he told the agents he could not consent because it was not his package.

Wilson does not argue that his consent to a search of the package was involuntary; rather, he contends he did not consent to a search under any circumstances. Indeed, there is no evidence that consent, if given, was involuntary. It is undisputed that Wilson was advised of his *Miranda* rights, had experience as an adult with the criminal justice system, was detained and questioned for only a short period of time before consent was requested, and was not subject to any physical punishment or deprivation.

As discussed above, the Court found not credible Wilson's testimony that the package was not his. For the same reasons, the Court finds not credible his testimony that he did not consent to a search of the package. Further, Wilson knowingly waived his *Miranda* rights. And, he agreed that when the agents told him he had been under surveillance for a period of time for shipping the methamphetamine to Florida, he said "What took you so long?" Thus, Wilson did not decline to participate in the interview or wholly deny involvement. Because the Court finds Wilson consented to a search of the package, the Court finds the agents did not need probable cause or a warrant.

### B. *MIRANDA*

In the motion to suppress his statement, Wilson argues that his *Miranda* waiver was not valid because it was affected by promises made by the agents. Accepting Wilson's statements at the evidentiary hearing as true, he testified that the agents' alleged promise regarding the release of Karwoski occurred more than 30 minutes after he waived his *Miranda* rights. He also testified that he chose to waive his *Miranda* rights and speak with the DEA agents. (RT 8/17/16 at 81-82.) Counsel for Wilson acknowledged in closing arguments for the evidentiary hearing that Wilson agreed to waive his *Miranda* rights. Therefore, the Court recommends the motion be denied with respect to a *Miranda* violation.

### C. VOLUNTARINESS

Even when the procedural safeguards of *Miranda* have been satisfied, a defendant is deprived of due process if his conviction is founded upon an involuntary confession. *See Dickerson v. United States*, 530 U.S. 428, 432 (2000). To ensure due process, the test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). In determining voluntariness, courts consider the defendant's age, education, and mental and physical health; whether the defendant was advised of his constitutional rights; the nature of any questioning; whether there was police coercion; the length of the interrogation, its location and its continuity; and the use of any physical punishment. *See United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (citing *Schneckloth*, 412 U.S. at 226); *Taylor v. Maddox*, 366 F.3d 992, 1015 (9th Cir. 2004). A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "In short the true test of admissibility is that the confession is

made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes*, 373 U.S. at 513-14.

In this case, Wilson does not assert there was police coercion; nor complain about the length of the interrogation, its location or its continuity; nor allege he was not advised of his rights. During the course of the one-hour interview there is no evidence that Wilson was deprived of food, water or rest. Wilson was 57 years old at the time he was arrested and had been interrogated on more than three prior occasions. (RT 8/17/16 at 78-79.) He was advised of his rights and interrogated across a desk within the DEA offices by SAs Chicas and Stark. (RT 7/18/16 at 42.) The Court finds there is no evidence of a police dominated or coercive environment.

Wilson's single claim is that his confession resulted from the direct promise of a benefit – Karwoski would be released if Wilson cooperated.[4] SA Chicas testified that he was present for the entirety of Wilson's interview and neither he nor any other agent made Wilson any promises. The Court believes it is worth noting that if Wilson had not refused to have the interview recorded, there would be little question what occurred during the interview. The Court finds Wilson's testimony regarding a promise was not credible. Although Wilson spoke compellingly at the hearing about his concern for his dog, he never mentioned this concern to the agents. (RT 8/17/16 at 83.)

According to Wilson he told the agents both that the package belonged to Karwoski and that Karwoski had nothing to do with shipping methamphetamine. Those statements are in direct contradiction to one another. At the hearing, Wilson agreed that when the agents stated that they had been conducting surveillance and knew he had been shipping methamphetamine to Florida for some time, he said, "What took you so long?" However, he stated that he did not confess or incriminate himself. Further, as discussed above, the Court found Wilson not credible with respect to ownership of the package. For

---

[4] In his motion, Wilson also alleges that the DEA agents promised that his Maricopa County pretrial release officer would not seek to revoke his release based on this arrest if he confessed. Wilson did not testify to any such promise at the evidentiary hearing; therefore, the Court does not evaluate it with respect to voluntariness.

- 11 -

all of these reasons, the Court finds Wilson was not credible when he testified that his confession was premised on a promise by the DEA agents to release Karwoski.

Even accepting Wilson's assertion of a promise as true, Wilson stated that it occurred thirty to forty-five minutes into a one-hour interview. This undermines Wilson's statement that his only statements to the agents were because of concern for his dog. Further, Wilson repeatedly testified that he did not incriminate himself, said very little and did not agree with anything the agents said. Again, accepting the truth of that statement, then Wilson was not compelled to confess based on a promise from one of the agents. Further, Wilson testified that the agents did not force him to make a statement. In light of Wilson's testimony, the Court finds that Wilson's statements during the interview were not the result of his will being overborn.

Discounting Wilson's testimony, there is no evidence of any promise or coercion. Accordingly, evaluating the totality of the circumstances, the government has demonstrated by a preponderance of the evidence that Wilson's statement was voluntary.

### III. RECOMMENDATION

It is recommended that, after its independent review of the record, the District Court deny Defendant's Motions to Suppress his Statements and the Fruits of Illegal Seizure (Docs. 29, 30).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 6th day of September, 2016.

*Lynnette C. Kimmins*
Honorable Lynnette C. Kimmins
United States Magistrate Judge